## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Demetreus Anthony McGinnis,

       Petitioner,

v.

Vicki Jansen,

       Respondent.

Case No. 19-cv-2376 (NEB/TNL)

**REPORT &**
**RECOMMENDATION**

Robert H. Meyers, Assistant Federal Defender, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Petitioner); and

Michael J. Lieberg, Chief Deputy County Attorney, Stearns County Attorney's Office, Administration Center, Room 448, 705 Courthouse Square, St. Cloud, MN 56303-4701 (for Respondent).

## I. INTRODUCTION

This action has been referred to the undersigned magistrate judge for a report and recommendation to the Honorable Nancy E. Brasel, United States District Judge for the District of Minnesota, pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This matter comes before the Court following a remand for further consideration by the district court. *See generally McGinnis v. Jansen*, No. 19-cv-2376 (NEB/TNL), 2020 WL 5768848 (D. Minn. Sept. 28, 2020) [hereinafter Order on R&R].[1] This Order assumes a familiarity with both the district court's Order on Report and Recommendation, *see generally* Order on R&R, 2020 WL 5768848, and the Court's prior Report & Recommendation, *see*

---

[1] ECF No. 31.

*generally McGinnis v. Jansen*, No. 19-cv-2376 (NEB/TNL), 2020 WL 5775849 (D. Minn. June 19, 2020) [hereinafter R&R],[2] *adopted in part and remanded in part*, Order on R&R, 2020 WL 5768848 (D. Minn. Sept. 28, 2020). Petitioner is represented by Assistant Federal Defender Robert H. Meyers. Respondent Vicki Jansen is represented by Chief Deputy County Attorney Michael J. Lieberg. For the reasons set forth below, this Court recommends that the Petition be denied and this action be dismissed with prejudice.

## II. BACKGROUND

Petitioner's remaining grounds for habeas relief claim ineffective assistance of appellate counsel for failing to obtain the redacted and unredacted versions of his statement to law enforcement and to raise on direct appeal the prosecutor's use of his statement and references to his post-arrest silence at trial.[3] Order on R&R, 2020 WL 5768848, at *4; R&R, 2020 WL 5775849, at *11; *see* ECF No. 34 at 3 [hereinafter Post-Remand Order].

### A. Petitioner's Statement to Police

"Following an incident in which [a guy] was shot and killed at around noon on March 13, 2014, [Petitioner] gave a statement to police at 2:35 p.m." *McGinnis v. State*, No. A17-1674, 2018 WL 3097169, at *1 (Minn. Ct. App. June 25, 2018) [hereinafter

---

[2] ECF No. 21.
[3] These claims were previously identified as Grounds 1(a) and 2(a). R&R, 2020 WL 5775849, at *6, 11; *see* Order on R&R, 2020 WL 5768848, at *4.

*McGinnis II*].  There is no dispute that Petitioner was read his *Miranda*[4] rights before speaking with police.  *See* Tr. 1024; *see also* Pet'r's Suppl. Br. at 2-3, ECF No. 49.

Petitioner told police that he "met with two guys in a car to sell them something." *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 2, ECF No. 6-3. "One of the guys got into [Petitioner's] car, handed [Petitioner] fake money, and then started to leave the car."  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 2.  Petitioner grabbed the guy's arm.  Unredacted Stmt. at 2.  "When [Petitioner] grabbed the guy's arm, the guy turned around, hit [Petitioner] in the face, and started running."  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 2. "[Petitioner] chased [the man], and the guy pulled out a gun before hitting [Petitioner] some more."  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 3. "The two wrestled, and the second guy joined the fray; both guys were kicking and kneeing [Petitioner]."  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 3.  "The gun went off twice, and after it went off the second time, one of the guys said 'somethin' like oh, s—t.'"  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 3.  One of the guys then "grabbed the gun, which was lying on the ground, pointed it at [Petitioner], and the gun just clicked."  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 3.  Afterwards, "the two guys drove away."  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 3.  "During the police interview, [Petitioner] said, 'I know that he got hit.'"  *McGinnis II*, 2018 WL 3097169, at *1; *accord* Unredacted Stmt. at 3.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Petitioner was also asked some demographic questions during the interview.  *See* Unredacted Stmt. at 4-6.  Among these questions were whether he had a cell phone. Unredacted Stmt. at 5.  Petitioner told police that he was in the process of replacing his phone and did not have one right now.  Unredacted Stmt. at 5.  When asked for his phone number, Petitioner told police that he used his girlfriend's phone and provided her phone number.  Unredacted Stmt. at 6.  When asked if he had spoken with his girlfriend lately, Petitioner told police that he had not.  Unredacted Stmt. at 6.

### B. Trial

"Petitioner proceeded to a jury trial."  R&R, 2020 WL 5775849, at *1.  The prosecution's theory of the case was that this was a drug deal gone wrong.  *See, e.g.*, Tr. 870-77, 911-13, 962-64, 968, 973-79, 985, 988-90, 1080-91, 1097-1104, 1108-09, 1135, 1206-10, 1219, 1222, 1260-69, 1491, 1506, 1567; *see also* Tr. 1037, 1068-70, 1543-44, 1552-56, 1559; *cf.* Tr. 996, 999, 1146-48.  The case primarily came down to who shot who.  *See, e.g.*, Tr. 1103-10, 1148-52, 1562, 1507, 1510, 1569, 1575-76; *see also* Tr. 1217-18.  Witness credibility was a recurrent theme.  *See, e.g.*, Tr. 606, 618, 621-22, 648, 916, 941, 983-85, 988-90, 998, 1002, 1004, 1006-11, 1062, 1131, 1136, 1142, 1144, 1150-51, 1160, 1202, 1252, 1489, 1492, 1544, 1551, 1557, 1559, 1587, 1593, 1597.

### 1. Opening Statements

During his opening statement, the prosecutor highlighted what Petitioner did not tell police in his statement.  Tr. 600.  The prosecutor told the jury that Petitioner did not mention "a female" had set up the sale transaction or that Petitioner had been riding around with a friend of his in the two hours after the shooting.  Tr. 600; *see* Tr. 601.  The

4

prosecutor also pointed out that Petitioner told law enforcement that he did not have a phone and used his girlfriend's phone and that he had not had contact with his girlfriend that day. Tr. 600; *see* Tr. 601. The prosecutor told the jury that Petitioner called up the woman who set up the transaction after the shooting, and met up with her after the shooting before he spoke with police. Tr. 600-01. The prosecutor explained that law enforcement "f[ound] out two days later the details of this because [Petitioner] didn't tell us this." Tr. 601. The prosecutor went on:

> When [Petitioner] is telling us that he's the victim and got jumped and he got his property stolen, did he call 911? Did he report that he had been robbed? Did he report that he had been assaulted? Did he call in that there had been a shooting and I'm not the guy who did it? Not for two hours and not the full story of what he was doing in the meantime.

Tr. 601.

The prosecutor again returned to what Petitioner did and did not tell law enforcement:

> [W]hen [Petitioner] showed up after that time he doesn't tell the police a simple [sic] word about any female being involved in the deal, meeting with a female at Holiday, buying her phone, not bringing her phone. Doesn't have his own phone. Says he really doesn't have a phone. He was in contact with [the female] that morning with his own phone and you'll hear from his girlfriend he had a phone.

Tr. 606.

Commenting on circumstantial evidence, the prosecutor told the jury that

> [c]ircumstantial evidence is just as viable as direct evidence. Two shots. Not one shot, two shots. One a contact wound, one a graze wound on the back of the arm to the front. Not

telling the full version of what happened, trying to cover up
what happened before, during and after.

Tr. 608.

### 2.  Trial Testimony[5]

"At trial, witnesses testified that this was a drug transaction gone bad and
Petitioner became upset when he was paid with counterfeit money."  R&R, 2020 WL
5775849, at *1 (citing *State v. McGinnis*, No. A15-1043, 2016 WL 3659127, at *1
(Minn. Ct. App. July 11, 2016) [hereinafter *McGinnis I*]).  "Witnesses testified that
Petitioner pointed a gun at the decedent, a struggle ensued, and the decedent was shot."
*Id.*

### a.  Sartell Investigator

During the prosecutor's case-in-chief and prior to Petitioner's testimony, the
prosecutor asked the Sartell-based investigator whether he "received any information, a
phone call or a 911 call from [Petitioner]" in the aftermath, to which the Sartell
investigator testified, "No, we had not."  Tr. 864; *see also* Tr. 934.

In talking about the investigation and conversation law enforcement had with an
individual who was with the decedent at the time of the shooting, the Sartell investigator
testified that "a female individual," subsequently identified as G. M., was named as
someone who had information regarding what had transpired.  Tr. 864-66.  The Sartell
investigator testified that G. M. came and spoke with law enforcement approximately two
days after the shooting.  Tr. 865-66; *see generally* Tr. 909-32.  The prosecutor asked the

---

[5] More than 20 witnesses testified during Petitioner's trial.  Although the Court has reviewed the entirety of their
testimony, the Court includes only relevant excerpts for context.

Sartell investigator whether, to his knowledge, Petitioner had "give[n] us any information about a female?"  Tr. 878.  The Sartell investigator testified that Petitioner had not.  Tr. 878.

The prosecutor later went into some detail about the statements G. M. had given to law enforcement, including that she had met with up with Petitioner and a friend of his, C. B., after the shooting.  *See, e.g.*, Tr. 916-17, 918-19, 921, 922; *see generally* Tr. 909-32.  The prosecutor asked the Sartell investigator whether Petitioner had "told us anything about meeting up with [C. B.] after the shooting."  Tr. 921.  The Sartell investigator testified that Petitioner had not.  Tr. 921.  The prosecutor similarly asked whether Petitioner told law enforcement about meeting up with G. M. after the shooting, and the Sartell investigator testified that he had not.  Tr. 926.

### b.    St. Cloud Investigator & Petitioner's Statement to Police

The St. Cloud-based investigator who took Petitioner's statement also testified.  Tr. 1019, 1022-24.  A recording of a redacted version[6] of Petitioner's statement was played for the jury and the jury was given a transcript to follow along with while they were listening to the statement.[7]  Tr. 1029-30.

### i.    Petitioner's Statement

During his statement, Petitioner told the St. Cloud investigator:

> We got into it, he hit me some more, yeah he pulled the gun first before he started hitting me.  I—it was right next to me. I had to try to grab him.  We were wrestling.  They were both jumpin' on me and kickin' me kneeing me and well, the gun

---

[6] "The parties stipulated to redactions of parts of the statement, including [Petitioner's] invocation of his right to remain silent."  *McGinnis II*, 2018 WL 3097169, at *1.

[7] The jury was not permitted to take the transcript with them into their deliberation.  Tr. 1029; *see* Tr. 1604-05.

went off twice, and then I don't know exactly when, but I know the second time it was when he was on top of me, and he said somethin' like oh, shit, and then it—it was on the ground, and he grabbed it, and he pointed it at me. I'm layin' there, and he pointed it at me. It just clicked though. It just— and so now I'm mad and I'm yelling at him and going after the car, and fuck you—fuck you.

Redacted Stmt. at 3, Resp't's App. Ex. 15, ECF No. 6-3 at 101-09.

After talking with the St. Cloud investigator some more, the following exchange occurred between Petitioner and the investigator:

Q:    Okay. Did you—

A:    Listen, I don't—I don't—I don't—I don't—I don't want to do the specific questions. This is what happened, and I know that I'm gonna go, I mean, in fuckin' jail, so I—I'll figure it out, but (indiscernible) I'm just—I just want to be done.

Q:    Relax—relax.

A:    I just want to be done. I want to call—

Q:    —You're tellin' me the stuff that—that you have got to get straightened out, because—

A:    —I told—I told you every [sic] I can—

Q:    —Did you—okay, let me ask you this—

A:    —I don't want to talk anymore.

Q:    Let me ask you—

A:    —I'm sorry—

Q:    —You don't have to talk—

A:    —Here's the main—here's the main part—here's the main part. I'm sorry. I should—I—I didn't do the

> right thing, and I know I didn't, and whatever
> happens—happens. I'm done.

> Q:    I'm gonna say a few things. You listen. You don't
>       have to talk, okay?

> A:    Okay.

Redacted Stmt. at 7-8.

A little while later, Petitioner stated:

> I don't always do the right thing, but I'm—eventually I got a
> surgery, and I couldn't work construction anymore until I got
> a job at [employer], work every day I get full-time job, and
> now my life is over again. I hurt somebody—I hurt
> somebody, and that's all I have to say. I just, it's just not my
> family I hurt. My kid is now hurt, I hurt my baby, I hurt my
> girlfriend is pregnant. I fucked up my whole life. All they do
> is tell me how proud they are. That's all I have to say.

Redacted Stmt. at 9.

### ii.    St. Cloud Investigator's Testimony

The prosecutor asked the St. Cloud investigator whether, to her knowledge,

Petitioner called 911 to report "being robbed, assaulted, or anything like that." Tr. 1030.

The St. Cloud investigator answered, "No." Tr. 1030; *see* Tr. 1038; *see also* Tr. 864,

934. The prosecutor also asked the St. Cloud investigator what Petitioner told her "about

a phone," and the investigator testified that Petitioner "said he didn't have one and that he

uses his girlfriend's." Tr. 1034; *see* Redacted Stmt. at 5-6. The prosecutor also inquired

whether the St. Cloud investigator had asked Petitioner if he had seen his girlfriend lately.

Tr. 1034. The St. Cloud investigator testified that she had and that Petitioner told her he

had not. Tr. 1034; *see* Tr. 1042; *see also* Redacted Stmt. at 6.

The St. Cloud investigator additionally testified:

> Q:    Did he ever reference that there was a female involved in this situation at all?
>
> A:    No.
>
> Q:    Did he ever tell you what he was doing between 11:51 and 2:00 p.m.?
>
> A:    No.
>
> Q:    Does he ever make any reference to being at the Holiday station after the shooting incident?
>
> A:    No.
>
> Q:    Does he ever reference being with . . . [his friend] that day?
>
> A:    No.

Tr. 1038; *see also* Tr. 878, 921-26.  On cross-examination, the St. Cloud investigator acknowledged that she did not ask Petitioner about a woman present, what he did during those approximately two hours that afternoon, whether he went to the Holiday gas station, or anything about his friend.  Tr. 1040.  On redirect, the St. Cloud investigator testified that she did not know about these individuals or events and therefore would not have known to ask.  Tr. 1041-42.

### c.    G. M.

G. M., a female acquaintance of Petitioner's, also testified at trial  Tr. 1079.  She testified that she had previously had conversations with Petitioner about selling marijuana.  Tr. 1080.  G. M. testified that Petitioner "sent [her] a picture and asked if [she] knew anybody that wanted to buy any weed."  Tr. 1080.  G. M. testified that the

decedent asked her "to hit up the guy that messaged [her] to buy." Tr. 1082. G. M. testified that she got in touch with Petitioner via text message and asked whether "he still had any weed for sale." Tr. 1083. G. M. further testified that Petitioner told her he still had marijuana for sale and arrangements were made to meet at the store where Petitioner worked. Tr. 1083-84, 1087.

G. M. testified that, after the shooting, she received a phone call from Petitioner, stating that he wanted to meet and purchase her phone. Tr. 1113-15. G. M. testified that she and Petitioner subsequently met at a Holiday gas station, and he gave her money for her phone. Tr. 1117, 1120-23.

### d.   Petitioner

### i.   Direct Examination

At trial, Petitioner testified that, on the day in question, he briefly stopped at the apartment he shared with his girlfriend in the morning to switch his shoes after showing up to work in tennis shoes. Tr. 1452-53. Petitioner testified that, when he returned to work, he was contacted by G. M., a friend of his, regarding phones he had for sale.[8] Tr. 1454-55. Petitioner told her he had two phones for sale with a price of $400 a piece or both for $700. Tr. 1455.

Petitioner testified that G. M. called him to let know him know that she was on her way and was bringing a friend. Tr. 1455-56. Petitioner testified that she called again when she was outside the store and he went out the back door to meet her. Tr. 146. Petitioner noticed that she was in a new vehicle and had her child with her. Tr. 1456-57.

---

[8] At the time, Petitioner worked as a sales representative for a cellular carrier. Tr. 1450-51.

Petitioner testified that G. M. then pointed over to van parked nearby.  Tr. 1457.
Petitioner went up to the van and "[t]here were two guys in [it]."  Tr. 1457.  Petitioner
introduced himself to the driver and saw the passenger (the decedent) "flipping through a
bunch of money."  Tr. 1457.  Petitioner asked the passenger "if he's the one who wants
the phone."  Tr. 1457.  The passenger answered affirmatively, and Petitioner walked
around the front of the van and tried to enter through the rear passenger door.  Tr. 1457.
He was not able to open the door, however, and so the passenger asked Petitioner to show
him the phones through the window.  Tr. 1457.

Petitioner declined, finding it "kind of suspicious that .  .  . the [van] was running,
it was facing towards the parking lot, and . . . they wanted to see [the phones] through the
window."  Tr. 1458.  Petitioner told the passenger to "just come to [his] car," and the
passenger got out and he and Petitioner went back to Petitioner's car.  Tr. 1458.
Petitioner entered through "the driver's side door" and the passenger entered through "the
passenger front door."  Tr. 1458.

Petitioner showed the passenger the phones and the passenger looked over both of
them, asking if Petitioner had "more electronics for sale."  Tr. 1458.  The passenger
"placed the phones in his lap, counted $700 out of the money that he had, and then"
handed the money to Petitioner.  Tr. 1459.  Petitioner testified that, "[a]s soon as [he]
grabbed the money," he noticed "it felt weird, it looked weird, and [he] knew it was
fake."  Tr. 1459.  Petitioner confronted the passenger about the money being fake, and
the passenger told him it was real.  Tr. 1459.  Petitioner refused to take the money and
"tried to hand it back to [the passenger]."  Tr. 1459.  The passenger grabbed the money

with his left hand and started to open the door with his right. Tr. 1459. Petitioner

testified that he "grabbed [the passenger's] left hand and . . . said, What are you doing?

And instead of pulling out, [the passenger] reached across and . . . punched [Petitioner] in

[his] left eye . . . ." Tr. 1459. Petitioner "let [the passenger] go and [the passenger] ran

out of the car towards the van." Tr. 1459.

Petitioner additionally testified:

Q:    When he got out of the vehicle you said and ran towards, back
      towards the van, what did you do?

A:    I did get mad and – after he punched me in the face, I ran out of my
      door and started running towards the van.

. . . .

Q:    And where do you meet up again with this passenger at?

A:    As I turned towards the –after I turned in front to the van towards the
      passenger door I started to turn – I noticed he hadn't opened up the
      passenger door. He had turned around and there was a gun in my
      face as I'm running at him. I put up my hands like this and tried to
      back up, and he came at me and he swung like that with the gun
      towards my head (indicating).

Q:    Then what happens then?

A:    I grab his arm. We started wrestling. And for a bit, it's maybe a
      couple seconds, might have been longer, I'm not sure, but I'm just
      trying to hold his arm up and he's, like, trying to hit me with his left
      hand, but then the gun goes off and it's by my head and it's going
      out in the direction towards the field behind us.

Q:    What happens after that?

A:    After the gun goes off. I take my left hand, I grab the gun, and I use
      both my hands and I tried to jerk it towards me. I tried to take it
      from him, and I jerk. And he grabs onto me and then he grabs onto
      the gun. We both have all four of our hands on it, it's between us,

and then he pushes.  I fall back.  He pushes me again and I fall on my back and he's on top of me and we're wrestling around on the ground.

Q:    So now you're on the ground at this point?

A:    Yes.

Q:    Does the driver of the v[an] get out?

A:    The driver of the v[an] does get out at this time.

Q:    And what does he try to do?

A:    He comes towards me.  He starts trying to kick and stomp on my head.  I'm putting up my shoulder like this (indicating), holding on. The person on top of me, he's yanking, yanking.  He's trying to point the gun towards me.  I feel – I'm trying to make sure that he doesn't, so when he pulled I pulled, when he pushes I push, and I'm like using all my strength to make sure that the gun doesn't point towards me.  He's jerking a couple of times, but the gun is jammed into my chest.  It's jammed into my ribs, jammed into my stomach, and he's laying down on top of it.  The driver come[s] out and he started trying to kick, and then he tries to reach for the gun too, and he's trying to pull him and the gun goes off.  At that time I was laying on my back.  [The passenger], he was on top of me straight up and trying to yank on the gun when the gun went off.

Q:    After the gun went off, what happened?

A:    [The passenger] yelled, Oh shit, and he backs up.  I back up too.  I felt a pinch in my hand and I thought I was shot.  Look at my hand, it's not shot.  I'm on my back.  I put up on my arm.  He's standing probably about five feet away from me.  He's got his hand down on the ground like this (indicating) with the gun on the ground.  He's kind of dragging it maybe a couple feet back up before he picks it up.  When he picks it up he points it at me.  I'm laying back.  I put my arms back up again and he pulls the trigger and this time it just clicks.

14

Tr. 1459-63. Petitioner testified that he "heard maybe two or three more clicks as [the passenger was] running back towards the van." Tr. 1463. The driver also ran back towards the van. Tr. 1463.

Petitioner testified that he got up and ran towards his car, yelling at the men in the van as they drove away. Tr. 1463. Petitioner testified that he got into his car and initially started to follow the van. *See* Tr. 1463-64. When asked on direct examination whether he called 911 at that point, Petitioner testified that he did not because he was scared, "thinking people were going to come after him" and he did not want to lose his job if "upper management found out." Tr. 1464. Petitioner testified that he started to drive home, but was so upset that he could no longer drive and pulled over to the side of the road to take a break. Tr. 1464-65.

Petitioner then decided to go to a friend's apartment, which was "a block or two away." Tr. 1465. Petitioner called his manager from the parking lot of the apartment building and told him that he was unable to come back to work because he was sick and then hung up. Tr. 1465. Petitioner then called his friend, C. B., and went up to C. B.'s apartment, where he "[l]aid in the couch, [his] head in [his] hands, trying to breathe, trying to think." Tr. 1466.

Approximately 10-20 minutes after he arrived at the apartment, Petitioner received a call from G. M. Tr. 1466. Petitioner testified that she was

> crying almost hysterically, she's saying Oh my God, are you
> okay? And, What happened? She told me that she couldn't
> get ahold of [the passenger]. And then she is saying that she
> was sorry, she had no idea it was going to happen, and she
> wanted to talk to me, and I wanted to talk to her.

15

Tr. 1466-67. Petitioner arranged to meet with her at a nearby gas station. Tr. 1467.

When they met up at the gas station, Petitioner

> told her that he had to go talk to the police and [he] asked her if she would come with [him]. She told [him], Absolutely not. She started crying again, saying that, [she] can't be involved with this, they're going to come after [her], and that she was saying that her – she didn't want her mom to find out anything had happened. And then [Petitioner] told her that if they arrest [him] [he was] going to have [his] lawyer come talk to [her], and she said, Absolutely I'll talk to him.

Tr. 1468-69. Petitioner was asked on direct examination whether he ever tried "to take her phone or buy her phone from her." Tr. 1469. Petitioner testified that he did not. Tr. 1469. Petitioner also testified that he did not threaten her. Tr. 1469.

Petitioner testified that, from the gas station, he went to the apartment he shared with his girlfriend. Tr. 1470. Petitioner testified that he called his girlfriend when he arrived and she came outside. Tr. 1470. Petitioner testified that he "gave her a hug and a kiss and t[old] her just relax, [he has] to go talk to the police. [He] was trying to sell these guys phones and they robbed [him] and somebody got shot, [he] believe[s]." Tr. 1470. Petitioner then returned to C. B.'s apartment for a little bit. Tr. 1471.

On direct examination, Petitioner was asked about the cell phone he had at the time, which was used to call G. M. and his girlfriend. Tr. 1471. Petitioner testified that he gave it to C. B. as "[h]e had wanted it back a couple months prior" as "he still owed money on it and wanted it back." Tr. 1472. Petitioner left the phone with C. B. at his apartment. Tr. 1472.

16

Petitioner testified that he "calmed down and drove [himself] back to [the store]," where he walked up to law enforcement.   Tr. 1472-73.   Petitioner testified that he subsequently gave a statement to police and, when asked if he was "being honest with the officer," Petitioner testified that he was.   Tr. 1473.   Petitioner was asked on direct examination why he told police that he "didn't want to answer any specific questions or . . . didn't want to answer too many questions."   Tr. 1473.   Petitioner testified that he called his attorney, told him what happened, and was advised to tell police what happened but not to answer questions if placed under arrest.  Tr. 1473-74.

On direct examination, Petitioner was asked why, if he was being honest with police, did he tell police that he had not spoken with his girlfriend on the day in question when he had in fact spoken with her.  Tr. 1474.  Petitioner acknowledged "[t]hat was a lie" and testified that he "wanted to leave her out of it" because she was pregnant at the time and "this was a lot of stress."  Tr. 1474.

On direct examination, Petitioner was also asked what he meant when he told police that he "do[es]n't always do the right thing."  Tr. 1475.  Petitioner testified that he meant "[t]elling . . . the truth."  Tr. 1475.  Petitioner additionally testified that he "was selling basically stolen property from [his] store" and he "didn't call the police when [he] should have and . . . was feeling guilt and remorse for it."  Tr. 1475.

### ii.    Cross-Examination

The prosecutor began cross examination with the following:

> Q:    The story you just told us is not the story you told [the
> St. Cloud investigator] on March 13th, is it?

17

A:    Yes, it is.

Q:    In its entirety?  You told her everything you just told us, is that what you're saying?

A:    I told her—

Q:    Yes or no.  Yes or no.

A:    What do you mean by "in its entirety"?

Q:    Did you tell her everything you just told us here today?

A:    No, I did not.

Q:    Okay.  You've had a long time to think about filling in the details, haven't you?

A:    Yes.

Tr. 1476.

The prosecutor also asked Petitioner about whether he had a phone on the day in question and Petitioner acknowledged that he did.  Tr. 1480.  The prosecutor continued:

Q:    Who owned the phone that you were using that day?

A:    [C. B.]

Q:    And so that's the day you decide to give him back the phone that you say he owned?

A:    I told him I was probably going to be under arrest and he said he wanted it back.

. . . .

Q:    Do you remember talking to [the St. Cloud investigator] about your phone?

A:    Yes.

18

Q:    What you just told us isn't what you told her about
your use of a phone that day, was it?

A:    No.

Q:    So what you told her wasn't true, was it?

A:    Correct.

Q:    So you lied about seeing your girlfriend and you lied
about using your girlfriend's phone.

A:    Yes, I did.

Q:    Didn't have anything to do with trying to cover up
what was going on that day, did it?

A:    No.

Tr. 1481.

The prosecutor asked about other inconsistencies between Petitioner's statement to

police and his testimony at trial:

Q:    Do you remember telling [the St. Cloud investigator]
that you were out back eating your lunch when all this
bad stuff happened?

A:    Yes.

Q:    That wasn't true, was it?

A:    No.

Q:    So when you tell [your counsel] that you're telling the
truth about everything and that's what you did when
you talked to [the St. Cloud investigator], that wasn't
true—that isn't true, is it?

A:    (No response.)

Q:    Is it?

19

A:     You mean every detail or the main things—

Q:     What else are we talking about here, Mr. McGinnis, other than the details?

A:     —I lied about?

Q:     I'm not asking you about them all.  You didn't tell the truth about everything that was going on—

A:     Right.

Q:     —is that accurate?

A:     Yes.

Q:     And you told her you were out back eating your lunch and that wasn't true.

A:     Yes.

Q:     And you told her you were back there selling something, right?

A:     Yes.

Tr. 1483-84.

On cross examination, the prosecutor also questioned Petitioner about the cell phones he was selling:

Q:     Well, you didn't tell the officer about any cell phones, did you?

A:     No, I did not.

Q:     Left that part out?

A:     Yes, I did.

20

Q:    In the framework of somebody getting shot and you being the victim of a robbery, are you telling us that you're concerned about getting in trouble with selling phones on the side and that's why you didn't tell [the St. Cloud investigator] about it?

A:    Yes.

Q:    That make sense to you?

A:    At the time I did not understand the gravity of the situation, yes.

. . . .

Q:    And  you don't know where they went, do you?

A:    I would not know that.

Q:    That's because they didn't exist, isn't that right?

A:    No, that's not true.

Q:    Instead, what you had was a pound of pot that you're giving him and now he's ripping you off and you figure that out.

A:    No, that is not true.

Q:    If there was a pound of pot, that is clearly illegal, and that would explain why you don't tell the police about what you're selling.  Wouldn't that make more sense for the jury to understand?

A:    If you say so.

Tr. 1486-87, 1491-92.

On cross-examination, Petitioner confirmed that he did not call the police between when the events in question took place and when he showed back up at the store around 2:00 p.m. that afternoon.  Tr. 1495.

21

The prosecutor asked Petitioner whether he had reviewed the transcript of the statement he gave and if "everything on there [was] true and accurate." Tr. 1499. Petitioner testified that it was except for an instance where "it said jag" instead of "jack" as in "they're trying to jack me." Tr. 1499; *see* Tr. 1499-50. The prosecutor continued:

Q:    Besides that, everything else accurate?

A:    Yes.

Q:    What she said, what you said?

A:    Yes.

Q:    You told her that you went to sell something.

A:    Yes.

Q:    Didn't tell her what.

A:    Correct.

Q:    Told her: "I don't want to answer too many questions."

A:    Correct.

Q:    Told her: "I don't want to do the specific questions.

A:    Correct.

Q:    Is that your idea or somebody else's?

A:    It was advised to me.

Q:    So you're going to tell the story you want to tell that day, right?

A:    The truth, yes.

Tr. 1500.

The prosecutor probed as to why Petitioner did not call the police when he was "the victim."  Tr. 1501; *see* Tr. 1501-02.  Petitioner testified that he was not comfortable speaking with law enforcement.  Tr. 1501-02.

The prosecutor returned to inconsistencies between Petitioner's testimony and his statement to law enforcement:

> Q:    You didn't mention one word about [G. M.] to [police], did you?
>
> A:    No, I did not.
>
> Q:    And based upon what you say, she said she was going to tell the story that you're telling us.
>
> A:    Yes.
>
> Q:    Then why wouldn't you tell [police] that there's a witness to the event?
>
> A:    No.
>
> Q:    You wouldn't do that?
>
> A:    No.
>
> Q:    Say you're using your girlfriend's phone.
>
> A:    Yes.
>
> Q:    And you don't have a phone when you get back.
>
> A:    Yes.
>
> Q:    You agree now that the story you told on March 13th was not the whole story, right?
>
> A:    Correct.
>
> Q:    And you're the one that decided to stop talking, right?

23

A:      Correct.

Q:      The officer was more than happy to let you tell her whatever you wanted to tell her, right?

A:      Yes, she was.

Q:      Including that you had met up with [G. M.] at the Holiday station before you came back, right? She would have listened to you?

A:      Would she have listened to me?

Q:      You could have told her that, right?

A:      Yes.

Q:      You could have told her that [G. M.] was involved in what was going on that morning, right?

A:      Yes.

Q:      You didn't do that?

A:      No.

Q:      You could have told her that you were in contact with [C. B.] and you didn't do that.

A:      Yes.

Q:      Could have told her you were running around for the two hours between the time of the shooting and the time you turned yourself in in [C. B.'s] car in part to stay away from the cops is what you said a little bit ago, right?

A:      Yes.

Q:      Didn't tell her that, did you?

A:      No.

24

Q:    Didn't tell her that [another woman] was at the Holiday station, did you?

A:    No.

Q:    Didn't tell her that [C. B.] was at the Holiday station, did you?

A:    No.

Tr. 1503-05.

### iii.    Redirect Examination

On redirect, Petitioner testified as follows:

Q:    When you told [the St. Cloud investigator] that you were wrestling on the ground with this individual and that they had pulled a gun on you and that the gun went off and that they picked up the gun and they pointed it at you again and then it clicked, that was what you told [the St. Cloud investigator] right away?

A:    Yes.

Q:    That wasn't the second story you told her?

A:    No.

Q:    Wasn't the third?

A:    No.

Q:    Wasn't the fourth?

A:    No.

Q:    It was the first thing you told her.

A:    Yes.

Tr. 1511-12.

### iv.    Recross-Examination

On recross-examination, the prosecutor returned to the inconsistences between

Petitioner's statement to police and his testimony at trial:

> Q:    You lied to her about a number of things when you
> were talking to the officer, correct?
>
> A:    Yes.
>
> Q:    You didn't tell her about a bunch of other things,
> correct?
>
> A:    Correct.
>
> Q:    You had not called 911 for two hours and you were the
> victim, correct?
>
> A:    Correct.
>
> Q:    You had a witness to this offense who was sympathetic
> to your plight when you were talking to [G. M.]
> according to you, correct?
>
> . . . .
>
> Q:    Correct?
>
> A:    She claimed that, yes.
>
> Q:    Then tell the cop about her.  Makes sense, right?
>
> A:    To who?
>
> Q:    Right?
>
> A:    Are you—
>
> Q:    I'm asking you.
>
> A:    Yeah.  Right.  Like you want me to say, yeah.

Q:    I don't care what you say.

A:    In the situation—

Q:    I'm asking you, if you have a witness to the offense
      and she's told you that she agrees with this version of
      events, you tell the cop about that witness, don't you?

A:    If—

Q:    Don't you tell the cop about that?

. . . .

A:    If I both believe her and we have agreed that she
      would talk to my lawyer, then, yes, that is something I
      would do in a different situation.

Q:    What difference does it make whether you believe her
      or not?  She's told you that she's sympathetic and you
      believe she's going to tell a story that's the same as
      yours and you left it out, right?

A:    Are you telling me?

Q:    No, I'm asking you.

A:    I—I'm—I feel like she might have set me up and I'm
      not sure what to believe.

Q:    Well, if she set you up she was part of the problem.

A:    Yes.

Q:    Then shouldn't you be reporting her as one of the guys
      who was ripping you off?

A:    Probably should be, yes.

Q:    Doesn't that make sense to you?

A:    Yes.

Q:    And what's this about having to talk to your lawyer? You're this one that's reporting the offense to the cops now at two o'clock that afternoon.

A:    She told me very explicitly that she did not want to be involved with the police.

Q:    So you honored that request despite the fact that you're the victim of this robbery and they're trying to kill you.

A:    Trying to kill me at the time or afterwards?  I don't understand what you're telling me—

Q:    I'm sorry.   I withdraw the question if it's too complicated for you.

Tr. 1512-15.

### e.   Closing Arguments

During closing arguments, the prosecutor talked about witness credibility.  *See, e.g.*, Tr. 1550-53.  As part of his closing, the prosecutor remarked:

> Defendant doesn't have to prove anything, but once he says his version of events – and he told us a version of events on March 13th and now today he gave us a new and improved version of events which seems to try to answer every single possible question that could be raised.  You can evaluate the credibility of the information provided to you by the defendant in the construct of this entire case.

Tr. 1551.  Discussing G. M.'s testimony, the prosecutor commented on one instance of impeachment and then stated: "The only impeachment that's happened now is the new and improved version you got from the defendant today on the stand.  You got zero of that back on March 13th when the defendant had every opportunity to tell his version of events."  Tr. 1552.

When discussing Petitioner's testimony, the prosecutor argued:

> Tells you today for the first time when all he told the officer
> when he came back to the ... store was he was selling
> something, selling these phones.
>
> . . . .
>
> They're nonexistent. That's because this wasn't a deal for
> phones. And does it make any sense to you that all this
> occurred as a result of phones and he's not going to report
> this major assault on his person? That's the victim's (sic)
> view of the world. I am the victim – or the defendant's view
> of the world. I'm the victim here.
>   Does he call 911 and report a robbery which involves
> somebody getting shot? He didn't do that. He tells you in
> part it's because I don't want to lose my job because I'm kind
> of selling these phones on the side and that would be bad for
> me and I don't trust the cops but I got to go talk to the cops.
> I'm going to tell them the whole truth is what he says at some
> point, only then he acknowledges it's not the whole truth.
> You can look at the statement he gave.[9] He doesn't call 911
> for two hours.
>   He doesn't tell the officer about his contact with [C.
> B.] He acknowledges that he's running around with [C. B.]
> in part to avoid being found by the cops. They're riding
> around in that red Oldsmobile.
>   Not a single word about the contact with [G. M.] at the
> Holiday station. Why doesn't he mention that when he
> professes that she's with him? She didn't play any role in it,
> whether he believes it or not, according to him. Shouldn't
> make any difference. If he knows he's got a witness out there
> who would support his version of events you tell the cop
> about it if that's true. Word zero.
>   Lies about parts of it. Haven't seen my girlfriend
> lately. I don't have a phone. Comes up with a story about
> what he did with his phone. He certainly didn't bring it back
> to [the store]. He doesn't bring it back to [the store] because
> that doesn't give us any piece of evidence to look at. Doesn't
> have [G. M.'s] phone that she told you I just sold it to him for
> $400 when she talks to us on Saturday.

---

[9] *But see supra* n.7 and Tr. 1604 (discussion regarding statement transcript being a court exhibit).

> . . . .
>
> If [G. M.] was sympathetic to the defendant's plight as he professes here today, wouldn't you tell the police regardless of what you thought she would say and forced [sic] her to tell your side of the story? Why would you leave it out? You leave it out because it ain't so.

Tr. 1556-59.

Later, the prosecutor similarly argued:

> And as importantly as anything else, his intent as expressed by his attempted cover-up. You buy one witness who you think might come forward, you buy her silence, or attempt to buy her silence, and even if she comes forward she now doesn't have a phone that corroborates there was phone contact between the two of you and you don't tell the cops jack about meeting her at the Holiday station or that she is professing she would come forward on your behalf and she's sympathetic to you.

Tr. 1562-63.

The prosecutor finished with:

> I ask that you evaluate the entirety of what you heard over the course of the past week and make a reasoned determination based upon your good judgement, your experience, your common sense and evaluation of the evidence and the testimony you have heard in conjunction with the story you heard from the defendant, and, more importantly, the pieces you didn't hear on March 13th, and now the new and improved version you heard from him on the stand here today and the pieces he conceded during the course of that testimony, ask that you return fair and just verdicts of guilty with regard to all six counts.

Tr. 1573-74.

After Petitioner's trial counsel presented his closing arguments, the prosecutor had an opportunity for rebuttal. *See generally* Tr. 1596-99. The prosecutor began his rebuttal with:

> Wow. The Oscars were on TV Sunday night. You saw a performance by [Petitioner] today and now you've heard, using some of the same terminology that I presented to you, reasonable or not in a framework that you got to ask yourselves does that in fact make sense. Asked you from the beginning to use your good judgment and your experience and your common sense to make a determination as to what occurred.

Tr. 1596. The prosecutor asked the jury to consider "[w]hat rings true, what doesn't ring true?" Tr. 1597.

Commenting on trial counsel's closing argument, the prosecutor stated:

> Who is not referenced when [trial counsel] told you about the case at the opening and just now told you about it again? Not one reference to the defendant's version, or lack thereof, of what happened. And why not? Because what he told isn't true and it doesn't ring true and he left pieces out. If he had told us from the beginning this new and incomplete version consistent with the argument you just heard that it now appears he thinks he does protest too much. It answers every single question there could possibly be. Does that ring true to you? If he told the officers true this new and improved version that he's presented today, that would have been investigated. What was investigated is the information they had as it came in piecemeal.

Tr. 1597-98. The prosecutor similarly stated that "[t]he issue is who told you true and who didn't tell you true." Tr. 1598.

Petitioner was "found . . . guilty of second-degree unintentional felony murder, third-degree murder, and witness tampering." *McGinnis II*, 2018 WL 3097169, at *1; *see*

*also McGinnis I*, 2016 WL 3659127, at *2.  Petitioner was sentenced to 210 months in prison.  *McGinnis II*, 2018 WL 3097169, at *1.

### C. Petition for Postconviction Relief

Petitioner filed a petition for postconviction relief with the state district court, raising multiple grounds for relief.  *See McGinnis II*, 2018 WL 3097169, at *1; *see also generally* Pet. for Post-Conviction Relief & Mem. in Supp., Resp't's App. Ex. 10, ECF No. 6-3 at 2-75 [hereinafter Postconviction Mem. I].  In relevant part, Petitioner argued he received ineffective assistance from both trial and appellate counsel in connection with the prosecution's use of his post-arrest silence as substantive evidence and for impeachment purposes in violation of his Fifth, Sixth, and Fourteenth Amendment rights. *See, e.g.*, Postconviction Mem. I at 2-14, 35-38.  As part of these arguments, Petitioner asserted that his appellate counsel was ineffective because counsel was not able to obtain Petitioner's complete file from trial counsel and therefore did not have access to the redacted and unredacted versions of his statement upon which these constitutional arguments were based.  *See, e.g.*, Postconviction Mem. I at 3, 46-47.

The state district court denied Petitioner's petition for postconviction relief.  *See generally* Findings of Fact, Conclusions of Law & Order, Resp't's App. Ex. 13, ECF No. 6-3 at 88-100 [hereinafter Postconviction Order I].  The state district court held that Petitioner's "claim[] that the prosecution committed misconduct by using his post-arrest silence as substantive evidence of his guilt" was procedurally barred because it was "based upon information contained in the transcript of trial court proceeding[s]" and Petitioner either knew or should have known about the claim at the time of his direct

appeal.  Postconviction Order I COL ¶ 6.  The state district court went on to consider,

however, whether the claim had "substantive merit" for purposes of an exception to the

procedural bar.  Postconviction Order I COL ¶ 7.  The state district court reasoned:

> After a defendant invokes the right to remain silent, that
> silence may not be construed to mean anything more than an
> exercise of their [sic] Fifth Amendment rights.  *Doyle v.
> Ohio*, 426 U.S. 610, 617 (1976).   However, defendants who
> speak after receiving *Miranda* warnings are not induced to
> remain silent and may voluntarily waive the constitutional
> right to remain silent.  If a defendant voluntarily waives that
> right, the prosecution may fairly cross-examine the defendant
> regarding any inconsistent statements he previously made.
> *Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam);
> *State v. Darveaux*, 318 N.W.2d 44, 49-50 (Minn. 1982).
>
> . . . .
>
> During police questioning, [Petitioner], after receiving his
> *Miranda* warning, voluntarily relinquished his right to remain
> silent and gave a voluntary statement to the police about his
> version of events.   Prior to trial, the parties stipulated to
> certain redactions from his statement to prevent the jury from
> learning that [Petitioner] invoked his right to remain silent by
> terminating the interview.   Because the prosecution may
> fairly impeach a defendant based on inconsistent statements
> given during a voluntary waiver of the right to remain silent
> and no other evidence of [P]etitioner's invocation of that right
> was given to the jury, the prosecutor did not commit
> misconduct or violate [P]etitioner's right to due process by
> eliciting testimony and commenting on inconsistent or
> omitted details given in his trial testimony.

Postconviction Order I COL ¶¶ 5, 7.

With respect to Petitioner's claim that he received ineffective assistance of trial

counsel based on counsel's "fail[ure] to object to the prosecution's unconstitutional use

of [his] silence as substantive evidence of . . . guilt when impeaching [P]etitioner's

testimony at trial," the state district court held that this claim was based on trial strategy and therefore "not reviewable." Postconviction Order I COL ¶ 19. The state district court also held that this claim was procedurally barred because it could "be determined on the trial court record." Postconviction Order I COL ¶ 19. The state district court further stated: "As stated above, only a redacted version of [P]etitioner's statement to police was entered into evidence and the prosecution committed no misconduct by using his post-arrest silence to impeach him at trial." Postconviction Order I COL ¶ 19.

As for Petitioner's claim that he received ineffective assistance of appellate counsel, the state district court stated:

> Petitioner claims that his appellate counsel performed deficiently by failing to obtain [Petitioner's] entire file from his trial attorney and to argue prosecutorial misconduct, and there is a reasonable probability that but for this error the results of the appeal would have been different. As stated above, there is no substantive merit to [P]etitioner's new claims of prosecutorial misconduct. As [P]etitioner cannot show that the results of his appeal would have been different if his appellate counsel had obtained the entire file, his appellate counsel did not perform deficiently.

Postconviction Order I COL ¶ 34.

### D. Postconviction Appeal

Petitioner appealed the denial of postconviction relief to the Minnesota Court of Appeals. *See generally McGinnis II*, 2018 WL 3097169. Among other things, Petitioner challenged the state district court's decision with respect to the prosecutor's use of his post-arrest silence as a violation of his Fifth Amendment rights; trial counsel's failure to object to such conduct by the prosecutor; and appellate counsel's failure to obtain his

complete file and raise these issues on appeal.  Postconviction App. Br. at 6-9, 10, 12, 14-26, Resp't's App. Ex. 5, ECF No. 6-2 at 2-53.

The Minnesota Court of Appeals held that, with the exception of the ineffective-assistance-of-appellate-counsel claim, the remainder of Petitioner's claims were "procedurally barred because [they were] based on events that occurred during [his] trial, and, therefore, [Petitioner] knew or should have known of the claims when he filed his direct appeal." *McGinnis II*, 2018 WL 3097169, at *2.  As for the ineffective-assistance-of-appellate-counsel claim, the Minnesota Court of Appeals began with the premise that "'[t]he Sixth Amendment guarantees a defendant the effective assistance of counsel at critical stages of a criminal proceeding.'" *Id.* (quoting *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017) (quotation omitted)).  And,

> [t]o establish ineffective assistance of appellate counsel, the petitioner bears the burden of showing both that counsel's performance was not objectively reasonable and, but for counsel's errors, the result of the proceeding would have been different.  The petitioner must overcome the presumption that counsel's performance fell within a wide range of reasonable representation.

> *Wright v. State*, 765 N.W.2d 85, 91 (Minn. 2009) (quotation and citation omitted); *see also* Minn. Stat. § 590.04, subd. 1 (2016) (stating that postconviction court is not required to hold an evidentiary hearing if "the files and records of the proceeding conclusively show that the petitioner is entitled to no relief").

*Id.*  Noting that it was "not clear from the record why appellate counsel did not obtain the entire file from trial counsel," the Minnesota Court of Appeals held that, "even if we

assume that appellate counsel's performance was deficient, we agree with the postconviction court that [Petitioner] is not entitled to relief because he failed to show that the results of his appeal would have been different if appellate counsel had obtained the entire file." *Id.* at *3.

The Minnesota Court of Appeals began with the United States Supreme Court's holding in *Doyle v. Ohio* "'that the use for impeachment purposes of [criminal defendants'] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.'" *Id.* (quoting 426 U.S. 610, 619 (1976)). The state appellate court explained that, "unlike the two defendants in *Doyle*, who said nothing about the alleged drug sale after they were arrested and received *Miranda* warnings, [Petitioner] gave police a statement about the events surrounding the shooting," and, "at trial, [Petitioner] testified about events that occurred during the two hours between the shooting and his arrest that he had not described in his statement to police." *Id.*

Acknowledging that "the prosecutor referred to [Petitioner's] failure to include these events in his statement to police" "[a]t various times" during the trial, the Minnesota Court of Appeals agreed with the state district court that the prosecutor's conduct did not amount to an "impermissibl[e] use[ of Petitioner's] post-arrest silence as substantive evidence of guilt and to impeach him." *Id.* at *3-4. Like the state district court, the Minnesota Court of Appeals based its decision on the United States Supreme Court's holding in *Anderson v. Charles* that *Doyle* does not apply to a cross-examination "'designed . . . to elicit an explanation'" as to why the defendant told police one version

of the events when he was arrested and testified to another version at trial. *Id.* at *4

(quoting 447 U.S. 404, 409 (1980) (per curiam)). The state appellate court reasoned:

> [L]ike the cross-examination in *Anderson*, the prosecutor's references to [Petitioner's] failure to include certain events in his statement to police were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement. Thus, the prosecutor did not commit misconduct by referring to the omissions from [Petitioner's] statement to police, and [Petitioner] has failed to show that the result of his appeal would have been different if appellate counsel had obtained an unredacted copy of his statement to police and argued that the prosecutor improperly referred to [Petitioner's] post-arrest silence.

*Id.*

### E. Petition for Further Review

Petitioner sought further view by the Minnesota Supreme Court. *See generally* Pet. for Review, Resp't's App. Ex. 9, ECF No. 6-2 at 102-11. Petitioner continued to challenge the prosecutor's use of his post-arrest silence; trial counsel's failure to object to such conduct by the prosecutor; and appellate counsel's failure to obtain his complete file and raise these issues on appeal. Pet. for Review at 2-3, 4-5, 7-9. The Minnesota Supreme Court denied the petition for further review. *McGinnis v. State*, No. A17-1674 (Minn. Aug. 21, 2018) (order).

## III. ANALYSIS

A state prisoner may seek a writ of habeas corpus in federal court on the ground that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A. AEDPA

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") limits habeas review to adjudications that:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quotation and citation omitted). Absent a claim that falls within the parameters of 28 U.S.C. § 2254(d), a habeas corpus petition will not prevail.

As stated by the district court,

> "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (citation and quotation marks omitted); *see Renico v. Lett*, 559 U.S. 766, 773 (2010) (stating that the Antiterrorism and Effective Death Penalty Act ("AEDPA") "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of

the doubt." (citations and quotation marks omitted)).  To that end, a federal court "cannot grant relief under AEDPA by conducting [its] own independent inquiry into whether the state court was correct as a de novo matter." *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004).  Rather, "a federal court is bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions." *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004) (citing 28 U.S.C. § 2254(d)).

Order on R&R, 2020 WL 5768848, at *4 (alteration in original).

### B.  Section 2254(d)(2): Unreasonable Determination of Fact

One of the questions posed to the parties by the Court in its Post-Remand Order mirrored § 2254(d)(2)'s unreasonable-determination-of-fact language: "Was the Minnesota Court of Appeals' conclusion that the prosecutor's conduct did not violate *Doyle* based on an unreasonable determination of fact in light of the evidence presented in the state court proceedings?"  Post-Remand Order at 8.  Responding to the Court's question, Petitioner argues that "it was unreasonable for the Minnesota Court of Appeals to make a factual determination that the prosecutor's questions and statements, when considered as a whole, were not designed to draw meaning from silence but to elicit an explanation for prior inconsistent statements."  Pet'r's Suppl. Br. at 25; *see generally* Pet'r's Suppl. Br. at 17-25.

Citing to *Finch v. Payne*, 983 F.3d 973 (8th Cir. 2020),[10] Respondent counters that Petitioner is not making a true factual challenge for purposes of § 2254(d)(2).  Respondent notes that "[t]he historical facts here are contained within the trial court

---

[10] *Finch* was issued after the initial Report & Recommendation, the district court's Order on the Report & Recommendation, and the Post-Remand Order.

record and [Petitioner] does not dispute the accuracy of the transcript, the trial court record, or the record on [his] appeal." Resp't's Suppl. Br. at 47-48, ECF No. 50. As such, Respondent maintains that, "[i]n reality, [Petitioner] is not challenging historical factual findings but rather the [Minnesota Court of Appeals'] application of the facts contained in the trial court record to the governing legal standard (*Doyle*)," and it is this application Petitioner "argues is unreasonable." Resp't's Suppl. Br. at 48.

In *Finch*, the Eighth Circuit Court of Appeals distinguished between mixed questions of law and fact under § 2254(d)(1)'s unreasonable-application inquiry and "purely factual" questions under § 2254(d)(2). 983 F.3d at 979 & n.5. The Eighth Circuit described "[i]ssues of fact" as "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators," distinguishing them from "[s]o-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations." *Id.* at 980 (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963) (citation omitted) (internal quotation marks omitted)). Where "the relevant historical facts of [the] case are immortalized in the respective court transcripts and filings and are undisputed by the parties," the Court is "tasked only with considering whether these historical facts satisfy the legal test chosen." *Id.* (quotation omitted).

Here too, the relevant historical facts are immortalized in the respective court transcripts and filings and are undisputed by the parties. *See id.* Moreover, Petitioner has not disagreed with Respondent's characterization of the nature of the inquiry. As will be discussed in greater detail below, *see infra* Section III.C.2, the fighting ground in this

case is the Minnesota Court of Appeals' application of *Doyle* and *Anderson* to the questions and statements made by the prosecutor during trial in reaching its determination that a claim the prosecutor improperly referred to Petitioner's post-arrest silence at trial would not have succeeded on appeal (and thus Petitioner was not prejudiced within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984)).  *Cf. Zinzer v. State of Iowa*, 60 F.3d 1296, 1299 (8th Cir. 1995) ("Whether appellate counsel was ineffective is a mixed question of law and fact.").  As such, this Court's "review is limited to determining only whether the [Minnesota Court of Appeals'] disposition of [Petitioner's] case involved an unreasonable application of clearly established [f]ederal law" under § 2254(d)(1).  *Finch*, 983 F.3d at 980 (quotation omitted).

### C. Section 2254(d)(1): Contrary to or an Unreasonable Application of Clearly Established Federal Law

A habeas petitioner may prevail under § 2254(d)(1) "by showing that the state court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Order on R&R, 2020 WL 5768848, at *4 (quoting 28 U.S.C. § 2254(d)(1)).

"For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"  *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *accord White v. Woodall*, 572 U.S. 415, 419 (2014); *see Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not 'an unreasonable application of' 'clearly

41

established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.").

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409; *see Yarborough*, 541 U.S. at 665 ("Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable."). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. "[A]n unreasonable application of [the Supreme Court's] holding must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White*, 572 U.S. at 419 (quotation omitted). This is a difficult standard to meet and "a substantially higher threshold." *Knowles*, 556 U.S. at 123 (quotation omitted); *see White*, 572 U.S. at 419; *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *see id.* at 102 ("[Section 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.").

Accordingly, "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set

of facts that there could be no 'fairminded disagreement' on the question." *White*, 572 U.S. at 427 (quoting *Harrington*, 562 U.S. at 103).

### 1. Right to Effective Assistance of Counsel

"The Sixth Amendment, applicable to the States by the terms of the Fourteenth Amendment, provides that the accused shall have the assistance of counsel in all criminal prosecutions.   The right to counsel is the right to effective assistance of counsel." *Missouri v. Frye*, 566 U.S. 134, 138 (2012) (citing *Strickland*, 466 U.S. at 686).   "To establish a constitutional violation, a petitioner must show both that counsel's performance was deficient and that the deficiency prejudiced his defense." *Barnes v. Hammer*, 765 F.3d 810, 813-14 (8th Cir. 2014) (citing *Strickland*, 466 U.S. at 687); *accord Woods v. Norman*, 825 F.3d 390, 394 (8th Cir. 2016); *Williams v. Roper*, 695 F.3d 825, 830 (8th Cir. 2012).   "Under *Strickland*, in evaluating whether an attorney provided objectively unreasonable assistance, a reviewing court should minimize the effects of hindsight and recognize a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Roe v. Delo*, 160 F.3d 416, 418 (8th Cir. 1998) (quoting 466 U.S. at 689).

*Strickland*'s two-prong test applies to claims "appellate counsel rendered ineffective assistance in violation of the Sixth Amendment." *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005).   As was done by the Minnesota Court of Appeals, this Court again assumes that appellate counsel's failure to obtain Petitioner's entire file, which contained the unredacted copy of his statement to police, and challenge on direct appeal the prosecutor's use of Petitioner's post-arrest silence at trial was deficient performance

under the first prong. *See McGinnis II*, 2018 WL 3097169, at *2. Turning to the second prong, in the context of an ineffective-assistance-of-appellate-counsel claim, there must be "a reasonable probability that the outcome of [Petitioner's] appeal would have been different if counsel had raised the claim" to show prejudice under *Strickland*. *Roe*, 160 F.3d at 418 (quotation omitted); *accord Pfau*, 409 F.3d at 939.

"Under § 2254(d), the 'pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.'" *Taylor v. Kelley*, 825 F.3d 466, 470 (8th Cir. 2016) (quoting *Harrington*, 562 U.S. at 101); *see Williams*, 695 F.3d at 831-32 ("[T]he proper question is whether there is any reasonable argument that the state court's judgment is consistent with *Strickland*." (quotation omitted)). As applicable in this case, the question is whether the Minnesota Court of Appeals unreasonably concluded that Petitioner was not prejudiced. *See Cullen*, 563 U.S. at 197-98. The reasonableness of the Minnesota Court of Appeals' conclusion that Petitioner was not prejudiced for purposes of a *Strickland* analysis turns on the reasonableness of the Minnesota Court of Appeals' determination that, had it been argued on appeal that the prosecutor improperly referred to Petitioner's post-arrest silence at trial, such a claim would not have succeeded.[11]

---

[11] Citing a case from the Second Circuit Court of Appeals, Respondent asserts that the Minnesota Court of Appeals would have reviewed Petitioner's claim for plain error. Resp't's Suppl. Br. at 11-12 (citing *Chrysler v. Guiney*, 806 F.3d 104, 119 (2d Cir. 2015)). In concluding that Petitioner was not prejudiced by appellate counsel's performance, the Minnesota Court of Appeals analyzed the merits of the claim that the prosecutor improperly referred to Petitioner's post-arrest silence. *See McGinnis II*, 2018 WL 3097169, at *3-4; Order on R&R, 2020 WL 5768848, at 2. Respondent acknowledges as much. Resp't's Suppl. Br. at 12 ("Admittedly, the [Minnesota Court of Appeals] did not explicitly conduct a plain[-]error analysis when it evaluated the prejudice prong and determined that [Petitioner] would not have been successful if a *Doyle* claim had been raised on direct appeal."). Respondent nevertheless contends that the Minnesota Court of Appeals "implicitly" conducted a plain-error analysis "by finding that the prosecutor's statements during trial did not violate *Doyle*." Resp't's Suppl. Br. at 12.

Respondent goes on to note "some similarities" between plain-error review and this Court's review under AEDPA. Resp't's Suppl Br. at 12-13. Ultimately, this line of argument culminates in the following conclusion:

### 2.  Post-Arrest Silence

Petitioner argues that, although the Minnesota Court of Appeals "correctly identified . . . the governing legal principles," it unreasonably applied them to his case. Pet'r's Suppl. Br. at 13.  Petitioner describes the error as occurring "at the confluence" of *Miranda*, *Doyle*, and *Anderson*.  According to Petitioner, the Minnesota Court of Appeals unreasonably applied *Miranda* and its progeny by failing to read *Doyle* in conjunction with *Miranda* and unreasonably expanded the holding of *Anderson*.

### a.  Governing Legal Principles

### i.  *Miranda v. Arizona*

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  In *Miranda*, the Supreme Court set forth certain "procedural safeguards to be employed" in order "to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it."  384 U.S. at  444.

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights,

---

In the context of either the AEDPA or plain[-]error analysis, [Petitioner] must first establish the *Doyle* rule he believes applies to the facts of his case including that such rule has been 'clearly established.'  He must then show that the clearly established rule was unreasonable applied in the context of *Strickland* prejudice. If he fails to do either, he cannot show that a plain[-]error analysis on direct appeal reasonably would have led to a successful appeal.

Resp't's Suppl. Br. at 13.  Respondent has not cited any controlling authority requiring this Court to graft on a standard of review in its evaluation of the reasonableness of the Minnesota Court of Appeals' determination that Petitioner's improper-references-to-post-arrest-silence claim would not have succeeded on appeal that was not in fact employed by the state appellate court in reaching that determination and the Court declines to do so here.

> provided the waiver is made voluntarily, knowingly and
> intelligently.  If, however, he indicates in any manner and at
> any stage of the process that he wishes to consult with an
> attorney before speaking there can be no questioning.
> Likewise, if the individual is alone and indicates in any
> manner that he does not wish to be interrogated, the police
> may not question him. The mere fact that he may have
> answered some questions or volunteered some statements on
> his own does not deprive him of the right to refrain from
> answering any further inquiries until he has consulted with an
> attorney and thereafter consents to be questioned.

*Id.* at 444-45; *see also id.* at 467-74, 478-79.   The Supreme Court made clear that "[o]pportunity to exercise these rights must be afforded . . . throughout the interrogation." *Id.* at 479.

### ii. *Doyle v. Ohio*

In *Doyle*, the Supreme Court "held that the Constitution prohibits the state from using silence to impeach a defendant's testimony at a later trial after he has invoked his post-*Miranda* right to remain silent."  *Ervin v. Bowersox*, 892 F.3d 979, 983 (8th Cir. 2018) (citing 426 U.S. at 619); *see, e.g.*, *Wainwright v. Greenfield*, 474 U.S. 284, 292 (1986) ("The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony.").  After the defendants in *Doyle* were arrested and read their *Miranda* rights, they elected not to speak with law enforcement.[12]  426 U.S. at 611-14.  At their separate trials, each testified that he had been framed and gave an exculpatory explanation for the events that had transpired.  *Id.* at 612-13.  On cross-examination, the prosecution asked each defendant "why he had not

---

[12] *See infra* n.13.

told the frameup story to [law enforcement] when [he was] arrested." *Id.* at 613. The Supreme Court held that the prosecution's inquiry and use of the defendants' post-arrest silence was inconsistent with *Miranda* because "[s]ilence in the wake of [a *Miranda* warning[] may be nothing more than the arrestee's exercise of th[o]se . . . rights." *Id.* at 617; *see also id.* ("[W]e have concluded that the [*Miranda*] decision compels rejection of the State's position."). Recognizing "that the [*Miranda*] warnings contain no express assurance that silence will carry no penalty," the Supreme Court stated that "such assurance is implicit to any person who receives the warnings," and, as a result, "it would be fundamentally unfair and a violation of due process to allow the arrested person's silence to impeach an explanation subsequently offered at trial." *Id.* at 618 (footnote omitted); *see also United States v. Burns*, 276 F.3d 439, 441 (8th Cir. 2002) ("In *Doyle*, the [Supreme] Court reasoned that the *Miranda* warnings given to the defendant carried an implicit assurance that the government would not penalize him by using his post-arrest silence against him." (citations omitted)).

### iii. *Anderson v. Charles*

In *Anderson*, the defendant was arrested and read his *Miranda* rights. 447 U.S. at 405. Police then proceeded to question the defendant about a stolen vehicle. *Id.* The defendant told police that he stole the car from an area "about two miles from the local bus station." *Id.* At trial, however, the defendant testified that he took the car from the parking lot of a tire shop next to the bus station, both of which were visible from the county jail. *Id.* On cross-examination, the prosecutor asked the defendant why he had not told police that he took the car from the tire shop if that was the truth. *Id.* at 405-06.

47

Recognizing that "*Doyle* bar[red] the use against a criminal defendant of silence maintained after receipt of governmental assurances," the Supreme Court concluded that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." *Id.* at 408; *see Ervin*, 892 F.3d at 983 ("The *Doyle* rule does not apply, however, to circumstances in which the state inquires into post-*Miranda* inconsistent statements about why a defendant was silent." (citing *Anderson*, 447 U.S. at 408-09)). The Supreme Court explained that the prosecutor's cross-examination was constitutionally permissible as it did not make "unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson*, 447 U.S. at 408. Noting that "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version," the Supreme Court rejected the idea that "*Doyle* . . . require[d] any such formalistic understanding of 'silence.'" *Id.* at 409.

### b. Not Contrary to *Doyle*

Petitioner asserts that the distinction drawn by the Minnesota Court of Appeals between his situation (in which he gave a statement and said something) and the *Doyle* defendants (who said nothing) is tantamount to holding that "only defendants who invoke the right to remain silent at the outset of questioning are afforded protection under *Doyle*." Pet'r's Suppl. Br. at 15; *see also, e.g.*, Pet'r's Reply at 4, ECF No. 4. Petitioner maintains that such a holding is unreasonable because, by "afford[ing] *Doyle* protection only to defendants who invoke their right to remain silent at the outset," their ability to

later and at any time invoke the right to remain silent under *Miranda* "would [be] render[ed] . . . meaningless."  Pet'r's Suppl. Br. at 16; *see Miranda*, 384 U.S. at 444-45.

It is worth noting that, at least in the Eighth Circuit, such an argument would likely be unsuccessful.  The Eighth Circuit Court of Appeals has held that

> [w]here the accused initially waives his right to remain silent and agrees to questioning, . . . no . . . inducement [to remain silent] has occurred.  If the accused subsequently refuses to answer further questions, the prosecution may note the refusal because it now constitutes part of an otherwise admissible conversation between the police and the accused.

*United States v. Harris*, 956 F.2d 177, 181 (8th Cir. 1992); *accord Burns*, 276 F.3d at 441-42; *cf. Ervin*, 892 F.3d at 984 ("In light of the fact that the United States Supreme Court has not decided whether a defendant's assertion of his previously waived *Miranda* rights may be used against him, the Missouri Court of Appeals' decision that no *Doyle* violation occurred did not constitute an unreasonable application of clearly established federal law.").  And, in *Burns*, the *Eighth* Circuit rejected the defendant's argument that "the written *Miranda* waiver that he signed [that] stated that he had 'been told that' he could 'stop talking any time'" compelled a different conclusion.  276 F.3d at 441-42.  At the same time, courts have acknowledged the circuit courts' "differing views" on "partial or selective silence" and "whether such silence should be admissible at trial against a defendant."  *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 104-05 (3d Cir. 2012) (listing cases); *see, e.g.*, *Jackson v. Biter*, No. 2:14-cv-2268 MCE DB P, 2020 WL 3510839, at *18 n.4 (E.D. Cal. June 29, 2020), *report and recommendation adopted*, 2021 WL 1056809 (E.D. Cal. Mar. 17, 2021), *appeal filed*, *Jackson v. Clark*, No. 21-

15676 (9th Cir. Apr. 19, 2021); *Shultz v. Terry*, No. 2:18-cv-00899, 2019 WL 2577970, at *27 (S.D. W. Va. Feb. 8, 2019), *report and recommendation adopted*, 2019 WL 1398071 (S.D. W. Va. Mar. 28, 2019). Significantly and importantly, however, the precise contours of the extent to which a prosecutor may comment on any post-arrest silence occurring *after* a defendant has voluntarily agreed to waive his *Miranda* rights and spoken with law enforcement is not the issue before this Court.

*Doyle* involved the exercise of the right to remain silent after receiving a *Miranda* warning.[13] *See Anderson*, 447 U.S. at 408 ("*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances."). The Supreme Court has described *Doyle* as holding "that the use for impeachment purposes of a defendant's silence, *at the time of arrest and after receiving Miranda warnings*, violates the Due Process Clause of the Fourteenth Amendment." *Brecht v. Ambrahamson*, 507 U.S. 619, 628 (1993) (quotation omitted) (emphasis added), and repeatedly stated that "*Doyle* rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial," *Wainwright*, 474 U.S. at 291 (quotation omitted). *See, e.g.*, *Brecht*, 507 U.S. at 628 ("The 'implicit assurance' upon which we have relied in our *Doyle* line of cases is the right-to-remain-silent component of *Miranda*."); *Wainwright*, 474 U.S. at 640 ("In *Doyle*, we held that *Miranda* warnings contain an implied promise, rooted in the Constitution, that 'silence will carry no penalty.'" (quoting 426 U.S. at

---

[13] The fact that one of the *Doyle* defendants had an *extremely* brief exchange with police did not change the Supreme Court's analysis. *See Anderson*, 447 U.S. at 407 n.2 ("One [*Doyle*] defendant said nothing at all. The other asked arresting officers, 'What's this all about?' When told the reason for his arrest, he exclaimed, 'you [sic] got to be crazy,' or 'I don't know what you are talking about.'" (citations omitted)).

618)); *Fletcher v. Weir*, 455 U.S. 603, 606 (1982) ("[W]e have consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."). Stated differently, *Doyle* holds that "it does not comport with due process to permit the prosecution during trial to call attention to [a suspect's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, unfavorable inference might be drawn as to the truth of his testimony." 426 U.S. at 619 (quoting *United States v. Hale*, 422 U.S. 171, 182-83 (1975) (White, J., concurring in judgment)); *accord Greer v. Miller*, 483 U.S. 756, 762-63 (1987); *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980).

Here, Petitioner did *not* remain silent in the wake of a *Miranda* warning. He chose to make a statement. On this basis, the Minnesota Court of Appeals distinguished Petitioner's circumstances from the circumstances of the *Doyle* defendants: "[U]nlike the two defendants in *Doyle*, who said nothing about the alleged drug sale after they were arrested and received *Miranda* warnings, [Petitioner] gave police a statement about the events surrounding the shooting" after he was read his *Miranda* rights. *McGinnis II*, 2018 WL 3097169, at *3. "[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson*, 447 U.S. at 408; *accord United States v. Ramos*, 826 F. App'x 131, 134 (3d Cir. 2020). Because Petitioner chose to make a statement to police after he was given a *Miranda* warning rather than exercise his right to remain silent as the defendants in *Doyle* had, the Minnesota Court of Appeals' conclusion that *Doyle* did not apply was not contrary to

51

clearly established federal law. *See McBride*, 687 F.3d at 104-05; *Rolan v. Coleman*, 680
F.3d 311, 326 (3d Cir. 2012); *Schultz*, 2019 WL 2577970, at *25-27; *see also Ramos*, 826
F. App'x at 134.

### c. Not an Unreasonably Application of *Anderson*

Petitioner argues that the Minnesota Court of Appeals unreasonably applied
*Anderson* "because the bulk of the prosecutor's statements and questions" were not
designed to "probe inconsistencies between [his] Mirandized statement and his testimony
at trial." Pet'r's Suppl. Br. at 16. Petitioner again emphasizes the limited nature of his
statement, characterizing his trial testimony as consisting of "entirely new subject matter"
rather than "conflicting statements involving the *same* subject matter" like *Anderson*.
Pet'r's Suppl. Br. at 17. The Court has reviewed the entirety of the trial testimony,
considering the prosecutor's statements and questions in context and as a whole.

As the Court stated previously, *Anderson* involved a patent inconsistency: the
defendant told the police one thing (he took the car from an area about two miles away
from the bus station) and testified to another (he took the car from the shop next to the
bus station). 447 U.S. at 405. There were similar patent inconsistencies between
Petitioner's statement to police and his testimony at trial, and a significant portion of the
prosecutor's questions and statements were focused on those inconsistencies. By means
of example, Petitioner told police that he did not have a cell phone and was using his
girlfriend's phone, but, at trial, Petitioner testified that he gave his phone to a friend
before going to the police. Similarly, when asked by police if he had spoken to his
girlfriend lately, Petitioner said that he had not. At trial, however, Petitioner testified to

speaking with her at least twice on the day in question—once in the morning when he went to change his shoes and again in the afternoon before he went to the police.

Petitioner himself acknowledges there were "a few proper questions, to be sure," Pet'r's Suppl. Br. at 18, but minimizes these as consisting of "a couple of minor details," Pet'r's Reply at 18. *See also, e.g.*, Pet'r's Suppl. Br. at 21 n.9, 24 n.12; Pet'r's Reply at 8 n.5. Yet, as to the topics of whether Petitioner had a cell phone and had recently spoken with his girlfriend, Petitioner had not remained silent at all. *See Anderson*, 447 U.S. at 408.

Additionally, a significant portion of the prosecutor's statements and questions also concerned what Petitioner did in between the shooting and when he returned to the store and spoke with law enforcement. At times, Petitioner argues that it was improper for the prosecutor to use this "silence," "namely, his not talking about what he did in the hours after the shooting before he approached police." Pet'r's Reply at 8; *see also, e.g.*, Pet'r's Suppl. Br. at 33 ("Indeed, there are no proper references to pre-*Miranda* silence in this case, a fact that utterly distinguishes this case from *Brecht*.").

But, as Respondent points out, this is *pre*-arrest silence to which *Doyle* does not apply. "[T]he Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest." *Brecht*, 507 U.S. at 628 (citing *Jenkins*, 447 U.S. at 239). In *Jenkins*, the defendant testified at trial that he killed the decedent in self-defense. 447 U.S. at 232-33. "[T]he prosecutor attempted to impeach the [defendant's] credibility by suggesting that the [defendant] would have spoken out if he had killed in self-defense." *Id.* at 235. On cross-examination, the prosecutor asked the defendant why he

had not told police about what happened until two weeks later.  *Id.* at 233.  During

closing arguments, the prosecutor "again referred to the [defendant's] prearrest silence"

and his delay in coming forward.  *Id.* at 234.  The Supreme Court held that no *Doyle*

violation occurred because "no governmental action induced [the defendant] to remain

silent before arrest."  *Id.* at 238, 240; *see also Fletcher*, 455 U.S. at 606 ("In *Jenkins*, we

noted that the failure to speak involved in that case occurred before the defendant was

taken into custody and was given his *Miranda* warnings, commenting that no

governmental action induced the defendant to remain silent before his arrest.").  Because

"[t]he failure to speak occurred *before* the [defendant] was taken into custody and given

*Miranda* warnings[, . . .] the fundamental unfairness present in *Doyle* [wa]s not present."

447 U.S. at 240 (emphasis added); *see also id.* ("We hold that the impeachment by use of

prearrest silence does not violate the Fourteenth Amendment.").

Similarly, in *Brecht*, the Supreme Court distinguished between proper use of pre-

arrest silence and improper use of post-arrest silence following *Miranda* warnings:

> The first time petitioner claimed that the shooting was an
> accident was when he took the stand at trial.  It was entirely
> proper—and probative—for the State to impeach his
> testimony by pointing out that petitioner had failed to tell
> anyone before the time he received his *Miranda* warnings at
> his arraignment about the shooting being an accident.  Indeed,
> if the shooting was an accident, petitioner had every reason—
> including to clear his name and preserve evidence supporting
> his version of the events—to offer his account immediately
> following the shooting.   On the other hand, the State's
> references to petitioner's silence after that point in time, or
> more generally to petitioner's failure to come forward with
> his version of events at any time before trial . . . crossed the
> *Doyle* line.  For it is conceivable that, once petitioner had
> been given his *Miranda* warnings, he decided to stand on his

> right to remain silent because he believed his silence would
> not be used against him at trial.

507 U.S. at 628-29.  Even Petitioner ultimately concedes that Respondent "is correct that references to the two-hour delay between the shooting and when [he] contacts the authorities is permissible under *Jenkins*."  Pet'r's Reply at 16.

The prosecutor's questions and statements also commented on whether police received certain information from Petitioner, including how the sale was arranged and Petitioner's forthrightness with law enforcement about what happened.  Certain things said by the prosecutor during opening statements and prior to the testimony of G. M. and Petitioner on direct examination may present a closer question given the point at which they occurred in the proceedings.  Viewing Petitioner's trial as a whole, however, and in light of the fact that Petitioner voluntarily spoke after being advised of his *Miranda* rights and was not induced to remain silent, *see Anderson*, 447 U.S. at 408, it is at least debatable that the questions and statements by the prosecutor in the wake of testimony from law enforcement, G. M., and Petitioner on direct examination were within the bounds of permissible cross-examination and closing argument.  *Cf. Brecht*, 507 U.S. at 628 ("Indeed, if the shooting was an accident, petitioner had every reason—including to clear his name and preserve evidence supporting his version of the events—to offer his account immediately following the shooting."); *Anderson*, 447 U.S. at 407 ("Any ambiguity in the prosecutor's initial questioning was quickly resolved by explicit reference to Detective LeVanseler's testimony, which the jury had heard only a few hours before."); *Doyle*, 426 U.S. at 619 n.11 ("It goes almost without saying that the fact of

post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." (citing *United States v. Fairchild*, 5050 F.2d 1378, 1383 (5th Cir. 1975)).

And, as the Court stated previously, there were a small handful of instances in which the prosecutor arguably called attention to Petitioner's invocation of the right to remain silent after having waived that right and given a statement. *See* R&R, 2020 WL 5775849, at *15 & n.10. But, "in light of the fact that the United States Supreme Court has not decided whether a defendant's assertion of his previously waived *Miranda* rights may be used against him, the [Minnesota Court of Appeals'] decision that no violation occurred did not constitute an unreasonable application of clearly established federal law." *Ervin*, 892 F.3d at 984.

Petitioner would have this Court narrowly construe the "subject matter" upon which a prosecutor could permissibly inquire under *Anderson*. Yet, in *Anderson*, the Supreme Court observed that "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." 447 U. S. at 409.

Applying *Anderson* to the facts of Petitioner's case, the Minnesota Court of Appeals concluded:

56

> At various times during [Petitioner's] trial, the prosecutor referred to [Petitioner's] failure to include these events in his statement to police. [Petitioner] argues that, when he failed to include the events in his statement to police, he was exercising his right to remain silent about the events, and the prosecutor's references were misconduct because they impermissibly used his post-arrest silence as substantive evidence of guilt and to impeach him.
>
> . . . .
>
> We conclude that, like the cross-examination in *Anderson*, the prosecutor's references to [Petitioner's] failure to include certain events in his statement to police were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement. Thus, the prosecutor did not commit misconduct by referring to the omissions from [Petitioner's] statement to police . . . .

*McGinnis II*, 2018 WL 3097169, at *3-4.

Under AEDPA's deferential standard of review, Petitioner "must demonstrate that, under [the Supreme] Court's precedents, no fairminded jurist could have reached the same judgment as the state court." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022) (quotation omitted); *see also Harrington*, 562 U.S. at 101-03. Given (1) the distinction between the *Anderson* defendant who chose not to remain silent after being advised of his *Miranda* rights and the *Doyle* defendants who chose to remain silent after the advisory; (2) the absence of Supreme Court precedent circumscribing the scope of the subject matter under *Anderson* to which permissible inquiry can be made; (3) *Jenkins'* allowance of commentary on pre-arrest silence; (4) "the fact that the United States Supreme Court has not decided whether a defendant's assertion of his previously waived *Miranda* rights may be used against him," *Ervin*, 892 F.3d at 984; and (5) the context in which the

majority of the prosecutor's questions and statements occurred, the Court concludes that the Minnesota Court of Appeals did not unreasonably apply *Anderson* to the facts of this case when it determined that no *Doyle* violation occurred.[14]

### 3. No Prejudice Shown

The Court now returns to the fundamental question at hand: "whether there is 'any reasonable argument' that the state court's judgment is consistent with *Strickland*." *Williams*, 695 F.3d at 831-32 (quoting *Richter*, 562 U.S. at 105); *accord Woods*, 825 F.3d at 395. Based on the record before the Court and for the reasons stated above, it was not objectively unreasonable for the Minnesota Court of Appeals to conclude that, had it been argued on appeal that the prosecutor improperly referred to Petitioner's post-arrest silence at trial, such a claim would not have succeeded, and therefore Petitioner failed to demonstrate prejudice resulting from appellate counsel's alleged deficient performance in failing to obtain his complete file and "argu[ing on direct appeal] that the prosecutor improperly referred to [Petitioner's] post-arrest silence." *McGinnis II*, 2018 WL 3097169, at *4. Having reasonably concluded that there was no reasonable probability that a claim the prosecutor improperly referred to Petitioner's post-arrest silence at trial would have affected the outcome of Petitioner's appeal and thus no prejudice had been shown, it was reasonable and consistent with *Strickland* for the Minnesota Court of

---

[14] Accordingly, the Court need not consider whether the prosecutor's questions and statements "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638; *see* Order on R&R, 2020 WL 5768848, at *5 ("If Doyle violations occurred, the court must also analyze ' in light of the record as a whole' whether the violation 'had a substantial and injurious effect on the verdict.'" (quoting *Brecht*, 507 U.S. at 638)).

58

Appeals to conclude that Petitioner had not shown appellate counsel was ineffective. *See Woods*, 825 F.3d 397.

## IV. CERTIFICATE OF APPEALABILITY

A habeas corpus petitioner filing a petition under 28 U.S.C. § 2254 cannot appeal an adverse ruling on his petition unless he is granted a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1). A Certificate of Appealability may be granted only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to do so, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, it is highly unlikely that any other court would treat Petitioner's claims for relief differently than they are being treated here. It is therefore recommended that Petitioner should not be granted a Certificate of Appealability in this matter.

[Continued on next page.]

## V. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, ECF No. 1, be **DENIED**.

2. This action be **DISMISSED WITH PREJUDICE**.

3. Petitioner should **NOT** be granted a Certificate of Appealability.


Date: July____25____, 2022                    _____*s/ Tony N. Leung*_____
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              District of Minnesota


                                              *McGinnis v. Jansen*
                                              Case No. 19-cv-2376 (NEB/TNL)


### <u>NOTICE</u>

**Filings Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).